UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| INTERMOUNTAIN FAIR HOUSING COUNCIL, JANENE COWLES, and RICHARD CHINN,<br><br>                    Plaintiffs,<br><br>vs.<br><br>BOISE RESCUE MISSION MINISTRIES and BOISE RESCUE MISSION, INC.,<br><br>                    Defendants. | CASE NO. CV-08-205-S-EJL<br><br>AMENDED<br>MEMORANDUM ORDER |

Intermountain Fair Housing Council, Janene Cowles, and Richard Chinn (collectively "Plaintiffs") brought this action against Boise Rescue Mission (the "Rescue Mission") claiming the Rescue Mission discriminated in housing in violation of the Fair Housing Act on the basis of religion and sex. The Court previously granted the Rescue Mission's motion for summary judgment (Docket No. 18) in a Memorandum Order filed on September 10, 2009. *See* Mem. Order (Docket No. 32). Currently before the Court is Plaintiffs' Motion to Alter or Amend a Judgment Pursuant to Federal Rule of Civil Procedure 59(e). (Docket No. 34). The Court grants in part and denies in part Plaintiffs' Motion to Alter or Amend (Docket No. 34). The Court grants the motion only to the extent that the Court has amended its decision as reflected in this

Amended Memorandum Order to address arguments raised by Plaintiffs.  The Court otherwise

denies the motion.  The Court also reaffirms its previous order granting Defendants' Motion for

Summary Judgment (Docket No. 18) and dismissing the case in its entirety.

I.

The Rescue Mission is an Idaho nonprofit corporation funded through charitable

donations from businesses, churches, and the general public.  Roscoe Aff. 1, ¶¶ 1, 4 (Docket No.

18, Attachment 3); Def. Stmt. Mat. Facts 1-2, ¶¶ 1, 4 (Docket No. 18, Attach. 1).  The Rescue

Mission operates two facilities in Boise:  the River of Life Rescue Mission located on 13th Street

("River of Life Facility"), and the City Light Home for Women and Children located on

Jefferson Street ("City Light Facility").  Roscoe Aff. 2, ¶ 6.  The Rescue Mission also formerly

operated a facility on Front Street in Boise that has now been closed.

A.     The Homeless Shelter Component and Plaintiff Chinn.

The Rescue Mission operates an "Emergency Services Program" that provides food,

shelter, clothing, and other life necessities to anyone in need, along with programs that provide

education, job-search, and work discipline training.  *Id.* 3, ¶ 7.  The Emergency Services

Program includes a homeless shelter component that provides a place of overnight repose and

safety for persons who otherwise would likely sleep on the streets, under bridges, in cars, or in

other unsafe places.  *Id.* 3, ¶ 10.  The Rescue Mission also offers a variety of religious services to

shelter guests, such as chapel services, pre-meal prayers, and morning devotions.  *Id.* 7, ¶ 14.

2

The Rescue Mission does not charge fees to shelter guests as a condition of receiving services, and the operation of the shelter does not generate revenue.  *Id.* 7, ¶¶ 18-19.

In general, the homeless shelter operates as follows:

a.  First time guests are provided with personal items (such as clean sheets, pajamas, razors, etc.) and are assigned a bed in a sleeping area.  A bed may be an actual bed, a mattress on the floor or space on the floor, depending on the number of guests that night, the capacity of the facility and the condition of the guest.  Guest sleeping areas are in dormitory-style rooms shared with many guests, but may also be in the day room, dining area or hallways during periods of high demand.  No guest has a private room.

b.  Guests may [check into] the homeless shelter between 4:00 pm and 5:30 pm. Guests who arrive after 5:30 pm but before 8:00 pm may be denied shelter depending on the reason for the late arrival.  Guests who arrive after 8:00 pm without prior authorization are generally denied shelter.  First time guests who could not have [checked in] at the above times are generally not denied shelter.  There is no advantage or right given to returning guests over new guests.

c.  Upon arrival and [check-in], guests must go to the day room or outdoor waiting area and remain there until 6:00 pm.

d.  At 6:00 pm, the Rescue Mission offers . . . services and programs to assist guests, including Christian chapel services, the Work Search Program, and counseling programs . . . .[1]

e.  At 7:00 pm, guests go [to] the dining area for evening food service.

f.  After dinner, guests perform any evening chores that may be assigned to them. These evening chores typically include cleaning tasks.

g.  After evening chores are completed, guests must shower and go to their assigned bed in the sleeping area.  Guests may read or quietly socialize with other guests in the sleeping area until lights-out quiet time at 10:00 pm.

---

[1] The parties dispute whether participation in religious services is voluntary.

h.  Guests are woken up at 6:15 am.  Any guest who intends to return for the next night must make his or her bed and store his or her pajamas under their pillow.

i.  Guests then go to the dining area for breakfast.

j.  After breakfast, guests complete any morning chores that may be assigned and may store certain belongings in a separate storage area with restricted access.  Personal belongings may not be left in sleeping areas during the day.

k.  Guests must vacate the premises by 8:00 am.

l.  Guests may return to the facility from Noon to 1:00 pm for lunch.  Otherwise, guests may not be at the facility unless they have a specific case management appointment.  Guests may not loiter at or near the facility.

m.  Guests are generally allowed to stay in the shelter for up to seventeen consecutive nights, except that there is no firm limit on number of consecutive nights that a guest may stay in the shelter during the winter season months (generally November to March).  This exception is due to the exceptional danger that cold weather presents to homeless individuals during the night.

. . . .

a.  Shelter guests generally may not receive telephone calls except as part of the Work Search Program.  Anyone who calls for [a] guest (other than law enforcement) will not be told if the person is a guest of the facility.  Depending on the nature of the call, the Rescue Mission staff may take a brief message for the guest (without disclosing to the caller whether or not the person is a guest) and post the message on a public bulletin board.

b.  The Rescue Mission generally does not accept or process mail for guests, other than mail from law enforcement or social service agencies that provide services to the homeless.

c.  Guests who participate in the Work Search Program are encouraged to get employment related mail or calls through the Work Search Program.

4

     d.  Guests may not hang pictures, decorate or personalize the bed area assigned to them.  Absent a need for reassignment, returning guests are typically assigned the same bed area each night to facilitate staff oversight and avoid having to wash all guest bedding materials every night (bedsheets for returning guests are generally replaced weekly).  The staff may relocate a bed assignment at any time without notice.

     e.  Guests may not come and go as they please.  Once a guest checks into the facility, the guest may not leave the facility until morning.  Shelter guests must return to the shelter _every_ night if they wish to continue to stay in the shelter.  A guest who fails to check into the shelter each night is generally prohibited from staying overnight at the shelter for 30 days.  Non-shelter services, such as food, clothing and social services, are still available to the guest during the 30 day period.  The purpose of this restriction is to help prevent the shelter from becoming an "occasional shelter" that helps enable a homeless lifestyle for the chronically homeless.

     f.  Guests may not have visitors of any kind other than law enforcement and case workers who work with the Rescue Mission.

     g.  Guests may not sleep in their own clothes.  They must use the provided pajamas.

     The above general operations of the shelter are subject to adjustments and accommodations depending on guest needs, the season, the facility, the facility capacity, and other factors.

Roscoe Aff. 3-6, ¶¶ 11-12 (emphasis in original) (footnote added); Def. Stmt. Mat. Facts 3-6,

¶¶ 11-12 (emphasis in original) (footnote added).

     Plaintiff Richard Chinn was periodically homeless during the years 2005 and 2006.

Chinn Aff. 1, ¶ 1 (Docket No. 28, Attach. 3).  He was a guest of the homeless shelter located at

the River of Life Facility for the periods of May 2-7, 2005 (five nights); October 9-10, 2005 (one

night); April 11-20, 2006 (nine nights); and May 11-17, 2006 (six nights).[2]  *Id.* at ¶ 2; Roscoe

Aff. 9-10, ¶ 31.  During his stays at the shelter, he had no other place to stay and intended to

remain in the shelter in excess of several months.  Chin Aff. 2, ¶ 3.  He always intended to return

to the shelter whenever he left.  *Id.*

Chinn asserts that he was told by shelter staff that he would be required to participate in

Christian religious activities such as chapel services in order to reside and eat meals at the

shelter.[3]  *Id.* at ¶ 4.  He observed that guests of the shelter who did not attend chapel services

were either required to wait in the dining room or were not permitted to enter the shelter until

chapel services were completed.  *Id.*  Guests who attended chapel services were able to obtain

food before those individuals who did not attend chapel services because they were always first

in the food line.  *Id.* at ¶ 5.  If the prepared food ran out, individuals who did not attend chapel

services would be given substitute food of inferior quality.  *Id.*

_____

[2] Chinn apparently was a guest at the now-closed Front Street homeless shelter during a portion of this period, and a guest at the River of Life Facility shelter during the remainder of the period.

[3] The Rescue Mission denies that Chinn was required to participate in religious services as a condition of staying at the shelter, or that preference is given to shelter guests who participate in the religious services.  However, the Court assumes, for purposes of summary judgment, the truth of Chinn's assertion that participation in the religious services was a condition of staying at the shelter and that preference is given to shelter guests who attend religious services.

Chinn found the practices of the shelter to be coercive, unpleasant, embarrassing, and

offensive to his religion. *Id.* 2, ¶ 6. He did, however, participate in the religious services out of

fear that if he did not participate, he would be denied housing and other services. *Id.* Of the

approximately fifty to seventy individuals staying at the shelter, Chinn observed fifteen to twenty

guests who refused to participate in religious services. *Id.* 2-3, ¶ 6. Individuals who attended

religious services or participated in the religious programs received better treatment than those

individuals who did not. *Id.* 3, ¶ 8. Because of the treatment he received at the shelter, he

stopped living at the shelter. *Id.* at ¶ 9.

B.     Discipleship Program and Plaintiff Cowles

The Rescue Mission also provides a New Life Discipleship/Recovery Program

("Discipleship Program" or "Program"), which is an intensive, one-year Christian-based

residential recovery program for individuals with drug or alcohol dependency. Def. Stmt. Mat.

Facts 7, ¶ 20; Roscoe Aff. 7-8, ¶ 20. The women's Discipleship Program is operated out of the

City Light Facility. Def. Stmt. Mat. Facts 7, ¶ 20; Roscoe Aff. 8, ¶ 20 and Exs. D-E.

The Discipleship Program is only open to individuals who are or desire to be of the same

faith as the Rescue Mission.  Def. Stmt. Mat. Facts 7, ¶ 22; Roscoe Aff. 8, ¶ 22. Residents of

the Discipleship Program are required to participate in a wide range of religious activities,

including worship services, Bible study, prayer, religious singing, public Bible reading, and

public prayer.  Def. Stmt. Mat. Facts 7, ¶ 23; Roscoe Aff. 8, ¶ 23. Residents also are required to

participate in housekeeping duties, such as sorting clothes, laundry, cooking, housekeeping, and office work.  Roscoe Aff. at Ex. E.  The Rescue Mission does not charge fees to individuals participating in the Discipleship Program and the Discipleship Program does not generate revenue.  Def. Stmt. Mat. Facts 8, ¶¶ 26-27.  However, residents who work full or part time generally are required to pay a $100 monthly room and board fee.  Roscoe Aff. at Ex. E.  This money is held for the resident and given back to the resident once he or she moves out of the facility with the goal being that this money will be used by the resident upon moving out as a down payment toward a place to live.  *Id.*

In October 2005, Plaintiff Cowles was in jail on drug-related criminal convictions.  Def. Stmt. Mat. Facts 9, ¶ 33.  Cowles contacted the Rescue Mission and requested that she be admitted into the Discipleship Program, stating that she was "focused on changing my life through God and spiritual growth," and that she is "desp[e]rately looking to fill this void in my life with spirituality and not drugs."  *Id.* 9, ¶¶ 33-34; Roscoe Aff. 10, ¶¶ 33-34 and Ex. F.  The judge presiding over Cowles' criminal case required Cowles to participate in City Light's residential substance abuse treatment program (the Discipleship Program) as a condition of being placed on probation.  Cowles Aff. 1, ¶ 1 (Docket No. 28, Attach. 2).

In March 2006, while she was still in jail, Cowles was interviewed by Discipleship Program staff and specifically informed of the Program's intense faith-based curriculum and the various rules of the Program.  Def. Stmt. Mat. Facts 9, ¶ 35.  On March 7, 2006, Cowles was

8

informed that she had been accepted into the Program.  *Id.* at ¶ 36.  Cowles chose to enter the Program and was transported from the jail to the City Light Facility on March 14, 2006.  *Id.* at ¶ 37; Cowles Aff. 1, ¶ 1.   When Cowles entered the Program, she was not a member of any particular faith or religion.  Cowles Aff. 2, ¶ 4.

As a resident of the Discipleship Program, Cowles was required to participate in religious activities including:  church services every Sunday either at the facility or at one of four Christian churches specified by Program staff; daily religious services that went throughout the day and during which Christian music was played; prayers and verse recitation from the Christian Bible; "laying on of hands" and praying out loud; and "casting out demons" using oil and holy water.  *Id.* 2, ¶ 6.  Cowles participated in all of the required services and activities except the required praying out loud.  *Id.* at ¶ 7.

Cowles was upset at being forced to adopt the Christian religion and repeatedly was told by Discipleship Program staff that "time is running," that she is "going to Hell," and that she "would be left behind" if she did not accept Jesus Christ as her personal savior.  *Id.* 2, ¶ 8.  She was told by Program staff that no one had ever graduated from the Program without becoming a Christian.  *Id.*  She was permitted only to read Christian books and listen to Christian music.  *Id.* When Cowles requested that she be allowed to change to a non-religious program, she was put on "30-day restriction" during which all her telephone calls with her attorney were monitored by Program staff and she was not allowed to participate in other limited activities that she

9

previously had been allowed.  *Id.* 3, ¶ 12.  Cowles also was required by Program staff to sing in a

religiously-based choir and engage in a public Bible reading.  *Id.* 3-4, ¶ 13.

Discipleship Program staff wrote a letter to Cowles' attorney in June 2006, requesting

that Cowles immediately be removed from the City Light Facility because the Discipleship

Program is a Christian-based program and Cowles was not in agreement with the biblically

based curriculum and classes required by City Light.  *Id.* 4, ¶ 15.  On August 20, 2006, Program

staff discussed with Cowles her continued participation in the Discipleship Program.  *Id.* at ¶ 16.

Cowles told staff that she had participated in the required activities but that she was not a

Christian.  *Id.*  Cowles informed staff that she had been advised by her attorney regarding

transfer to another facility, and requested the staff's assistance in obtaining a transfer.  *Id.*  The

staff responded that because Cowles had not opened her heart to Christianity, her only option

was to go back to jail.  *Id.*  The staff subsequently contacted Cowles' probation officer on

August 30, 2006.  *Id.*  Cowles was removed from the Program and the City Light Facility

because she was not a Christian.  *Id.* 4, ¶ 17; *id.* 5, ¶ 19.

Discipleship Program staff wrote a letter to the judge presiding over Cowles' criminal

case and informed the judge that Cowles "struggled with the Christian based program that was

offered."  *Id.* at Ex. E.  Staff informed the judge that Cowles' attitude was "normally very

appropriate," but that Cowles struggled because she did not agree philosophically with the

Program.  *Id.*  Staff recommended to the judge that Cowles be given an opportunity to complete

10

a non-faith-based program to allow her to "better focus on her recovery without the confliction

of her beliefs." *Id.*

Plaintiffs filed this action against the Rescue Mission alleging the Rescue Mission

violated the Fair Housing Act by engaging in religious and sex discrimination as prohibited by

42 U.S.C. §§ 3604(a) (otherwise make unavailable a dwelling), 3604(b) (discriminate in terms,

conditions, or privileges), and 3617 (interference in exercise or enjoyment of fair housing rights).

*See* V. Compl. 12-13, ¶¶ 48, 50, 52 (Docket No. 1).  The Rescue Mission moved the Court for

summary judgment on all claims raised by Plaintiffs.  The Court granted the motion in a

Memorandum Order filed on September 10, 2009.  *See* Mem. Order (Docket No. 32).  Plaintiffs

have moved the Court to alter or amend the judgment pursuant to Federal Rule of Civil

Procedure 59(e).  *See* Mot. Alter or Amend Judg.  (Docket No. 34).  The Court grants the motion

to amend only to the extent that the Court has amended its decision as reflected in this Amended

Memorandum Order to address arguments raised by Plaintiffs.  The Court otherwise denies the

motion and reaffirms its previous order granting Defendants' Motion for Summary Judgment.

## II.

Summary judgment is proper when "the pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine"

only if there is a sufficient evidentiary basis on which a reasonable factfinder could find for the

nonmoving party, and a dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact. *Id.* at 256-57. The Court must view all the evidence in the light most favorable to the nonmoving party. *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

In response to a properly submitted summary judgment motion, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Henderson v. City of Simi Valley*, 305 F.3d 1052, 1055-56 (9th Cir. 2002). The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991).

An affidavit supporting summary judgment "must be made on personal knowledge, set forth such facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e). "Conclusory affidavits that do not affirmatively show personal knowledge of specific facts are insufficient." *Casey v. Lewis*, 4 F.3d 1516, 1527 (9th Cir. 1993).

A court "generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented." *Agosto v. INS*, 436 U.S. 748, 756 (1978). "[A]t the

summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

III.

A.    <u>The homeless shelter component of the River of Life Facility[4] is not a "dwelling" and therefore is not subject to the requirements of the Fair Housing Act</u>.

The FHA makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a *dwelling* . . . because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(b) (emphasis added).  The FHA defines a "dwelling" as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof."  42 U.S.C. § 3602(b); *see* 24 C.F.R. § 100.20(b) (providing the same definition of "dwelling"); 24 C.F.R. § 100.201 (defining "dwelling unit" as including "sleeping accommodations in shelters intended for occupancy as a *residence* for homeless persons" (emphasis added)).

Although the term "residence" is central to the definition of a "dwelling," the FHA does not define "residence."  However, the ordinary meaning of "residence," which the Court assumes

---

[4] The Court does not need to address whether the Discipleship Program component of the City Light Facility is a "dwelling" under the FHA because the Rescue Mission admits that it is.

13

Congress intended, *see Mills Music, Inc. v. Snyder*, 469 U.S. 153, 164 (1985), is "a temporary or permanent dwelling place, abode or habitation to which one intends to return as distinguished from a place of temporary sojourn or transient visit." *United States v. Hughes Mem'l Home*, 396 F. Supp. 544, 549 (W.D. Va. 1975) (quoting Webster's Third New Int'l Dictionary); *see United States v. Columbus Country Club*, 915 F.2d 877, 881 (3d Cir. 1990).

In determining whether the shelter is a "dwelling," and therefore covered by the FHA, the Court is cognizant of the FHA's stated policy "to provide, within constitutional limitations, for fair housing throughout the United States"; and generously construes the FHA to further the "broad and inclusive" compass of its protections. *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731 (1995) (quoting 42 U.S.C. § 3601; *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209 (1972)).

Courts have found two factors relevant in determining whether a facility is a dwelling under the FHA: (1) "whether the facility is intended or designed for occupants who 'intend to remain in the [facility] for any significant period of time'"; and (2) "whether those occupants would 'view [the facility] as a place to return to' during that period." *Lakeside Resort Enterps. v. Bd. of Supervisors of Palmyra Township*, 455 F.3d 154, 158 (3d Cir. 2006); *see Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1215-16 (11th Cir. 2008); *Cohen v. Township of Celtenham*, 174 F. Supp. 2d 307, 323 (E.D. Pa. 2001); *see also Hughes Mem'l Home*, 396 F.

14

Supp. at 549 (holding that a children's home is a dwelling because the home is more than a place of temporary sojourn to the children who live there).

The Ninth Circuit has not "squarely addressed the issue of whether all temporary shelters fit within the [FHA's] definition of 'dwelling.'" *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1048 n.2 (9th Cir. 2007).  In *Turning Point, Inc. v. City of Caldwell*, 74 F.3d 941, 942 (9th Cir. 1996), the Ninth Circuit applied the FHA to a homeless shelter, but did not address whether the FHA generally applies to homeless shelters because the parties did not dispute the FHA's applicability.  *See id.*; *see also Community House*, 490 F.3d at 1048 n.2.

In *Community House*, the Ninth Circuit was again faced with application of the FHA to a homeless shelter.  *See Cmty. House*, 490 F.3d at 1048 n.2.  However, the Court declined to address whether a homeless shelter would fall within the FHA's definition of a "dwelling" because the proposed facility at issue in the case would serve not only as a homeless shelter providing transient overnight housing, but also would provide forty-nine transitional housing units in which residents would reside for up to a year and a half, generating up to $125,000 in rent each year.  *Id.*  Thus, the facility "contained both a homeless shelter and a low income housing unit."  *Id.* at 1046.  Under this factual scenario, the Court had "little trouble concluding that at least part of the facility" was a "dwelling" and therefore was subject to the FHA.  *Id.*

Apparently, the facility at issue in *Community House* was housed in the same building that now houses the River of Life Facility.  The facility at issue in *Community House* was

15

managed by the City of Boise and, at the time of the *Community House* case, included rent-generating transitional housing units.  *See Cmty. House*, 490 F.3d at 1045.  The building subsequently was leased to the Rescue Mission and no evidence in the record indicates that the River of Life Facility operated by the Rescue Mission contains transitional housing units or that the facility generates rental income.  The *Community House* decision does not, therefore, control the outcome of the present case.

In *Woods v. Foster*, 884 F. Supp.1169, 1173-74 (N.D. Ill. 1995), the District Court for the Northern District of Illinois held that, under the generous construction a court must give to the FHA, a homeless shelter was a "dwelling" because the individuals who stayed at the shelter had no other place to "return to" or reside.  The shelter at issue in *Woods* provided housing for homeless families and assisted those families in obtaining other services, including permanent housing.  *Id.* at 1171.  The *Woods* court noted that although the length of time an individual expected to live at the shelter was a factor in determining whether the shelter was a "residence" and thus a "dwelling," it was not the exclusive factor.  *Id.* at 1173.  "Because the people who live in the Shelter have nowhere else to 'return to,' the Shelter is their residence in the sense that they live there and not in any other place."  *Id.* at 1173-74.  The court was not persuaded that a one-hundred-twenty-day stay—which the defendants claimed was the maximum period of time an individual was allowed to stay at the shelter—was a "transient visit" making the shelter merely a form of accommodation, like a hotel.  *Id.* at 1174.  "The women in the Shelter inhabit the

16

Shelter, although the length of time they live there depends on their success in finding more permanent housing.  Their residence is not so short-lived or transient that the Shelter can be considered a mere public accommodation."  *Id.*

In *Johnson v. Dixon*, 786 F. Supp. 1, 4 (D.D.C. 1991), the District Court for the District of Columbia found it doubtful that an emergency overnight shelter would be subject to the FHA:

> The Act, in terms, protects only "buyers" and "renters" from unlawful discrimination. Plaintiffs, and the other inhabitants of the two shelters, are neither.  Such accommodations as they have had at the shelters in the past have been provided *gratis* by the [defendants].  It is, moreover, doubtful if "emergency overnight shelter," . . . *i.e.*, a place of overnight repose and safety for persons whose only alternative is to sleep in the alleys or doorways, can be characterized as a "dwelling" within the Act, even if it may seem like home to them.

*Id.*  The court assumed, however, that the FHA anti-discrimination provisions applied to shelters for the homeless for purposes of addressing (and ultimately denying) the plaintiffs' motion for a preliminary injunction.  *Id.*

Outside of the homeless shelter context, courts have held that the term "dwelling" does not extend to cover a city jail, *see Garcia v. Condarco*, 114 F. Supp. 2d 1158, 1160 (D.N.M. 2000); or lodging for transient guests, such as a hotel or a bed and breakfast.  *See Patel v. Holley House Motels*, 483 F. Supp. 374, 381 (S.D. Ala. 1979) (hotel); *Schneider v. County of Will*, 190 F. Supp. 2d 1082, 1086-87 (N. D. Ill. 2002) (bed and breakfast).

On the other hand, courts have held that the term "dwelling" does cover summer bungalows, *see Columbus Country Club*, 915 F.2d at 881; cabins for migrant farm workers,

*Villegas v. Sandy Farms, Inc.*, 929 F. Supp. 1324, 1327-28 (D. Or. 1996); a nursing home,

*Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096, 1102 (3d Cir. 1996); a drug-and-alcohol

treatment facility, *Lakeside Resort Enterprises*, 455 F.3d at 160; a group home for recovering

drug and alcohol addicts, *Schwarz*, 544 F.3d at 1214; a group home for children, *Cohen*, 174 F.

Supp. 2d at 323; and a former office building converted to a hospice facility for AIDS patients,

*see Baxter v. City of Belleville*, 720 F. Supp. 720, 721 (S.D. Ill. 1989).

      Here, the undisputed evidence demonstrates that guests of the shelter are not charged a

fee for staying in the shelter; are assigned a bed in a dormitory-style room, a hallway, or the day

room; generally are allowed to stay for a maximum of seventeen consecutive nights (except

during the winter months when the maximum stay is more flexible due to the danger that cold

weather presents to homeless individuals during the night); are not guaranteed the same bed each

night they return; with limited exceptions, are not allowed to stay at the shelter during the day,

are required to leave the shelter every morning by 8:00 a.m., and may not return, except for

lunch, until 4:00 p.m.; are not allowed to leave the shelter once they arrive in the evening;

generally are not allowed to stay at the shelter on a particular evening if they do not check in

during the designated hours; are not allowed to personalize the bed area assigned to them or

leave belongings in their bed area; and, with extremely limited exceptions, are not allowed to

receive phone calls, mail, or have visitors at the shelter.

The Court finds that the shelter is neither intended nor designed for occupants who intend to remain there for any significant period of time. *See Lakeside Resort*, 455 F.3d at 158. Moreover, although shelter guests may have the subjective intent of returning to the shelter, *see id.*, the Court finds that the conditions under which a guest may stay at the shelter demonstrate that the shelter is not "a temporary or permanent dwelling place, abode or habitation to which one intends to return," but is instead a "place of temporary sojourn or transient visit." *Hughes Mem'l Home*, 396 F. Supp. at 549 (quoting Webster's Third New Int'l Dictionary); *see Johnson*, 786 F. Supp. at 4. Accordingly, the Court holds that the homeless shelter is not a "dwelling" subject to the FHA.

The Court recognizes that in *Woods*, a homeless shelter was found to be a "dwelling." *See Woods*, 884 F. Supp. at 1173-74. The *Woods* case is, however, distinguishable from the present case because the guests in *Woods* were allowed to stay for a much longer period of time (up to one-hundred-twenty days) and nothing indicates that the shelter in *Woods* imposed restrictions on the guests similar to those the Rescue Mission imposes on its shelter guests. *See id.* Further, the Court is not convinced that a homeless shelter is a "dwelling" simply because the guests have "nowhere else to 'return to,'" *see id.*, because, under that interpretation of "dwelling," *any* building or structure in which a homeless person is sleeping and storing his or

19

her possessions would be considered a "dwelling" based simply on the intent and circumstances of the homeless person.[5]

B.   The Rescue Mission's operation of the homeless shelter and the Discipleship Program does not fall within the FHA's religious exemption.

The Rescue Mission denies that it requires guests of its homeless shelter to attend or participate in religious services, or that it gives preference to guests of the homeless shelter based on such attendance or participation.  The Rescue Mission argues that, even assuming it did impose such requirements or give such preference, its actions in doing so would fall within the FHA's religious exemption,  42 U.S.C. § 3607(a).  Similarly, the Rescue Mission argues that the religious requirements it imposes on the residents of its Discipleship Program fall within the FHA's religious exemption.

The FHA's religious exemption provides:

Nothing in this subchapter shall prohibit a religious organization, association, or society, or any nonprofit institution or organization operated, supervised or controlled by or in conjunction with a religious organization, association, or society, from limiting the sale, rental or occupancy of dwellings which it owns or operates for other than a commercial purpose to persons of the same religion, or from giving preference to such persons, unless membership in such religion is restricted on account of race, color, or national origin.

42 U.S.C. § 3607(a).

---

[5] Although the Court concludes the shelter is not a "dwelling" subject to the FHA, the Court alternatively holds, as discussed below, that the Rescue Mission's alleged religious activities in relation to the operation of the shelter are protected by the First Amendment.

There is no evidence, nor argument by the parties, that membership in the Rescue

Mission's religion is restricted on account of race, color, or national origin.  *See* 42 U.S.C.

§ 3607(a).  Therefore, to demonstrate that its activities fall within the religious exemption, the

Rescue Mission must demonstrate (1) that it is a religious organization, or is operated,

supervised, or controlled by or in conjunction with a religious organization; (2) that it operates

the homeless shelter and Discipleship Program for "other than a commercial purpose"; and

(3) that it limits occupancy of the shelter and residence in the Discipleship Program to persons of

the same religion, or gives preference to such persons.

> 1.    <u>The Rescue Mission is a religious organization that operates the homeless shelter
> and Discipleship Program</u>.

The Rescue Mission was "created for the purpose of providing for the worship of God,

the teaching and preaching of the Word or God, the winning of people to a personal faith in the

Lord Jesus Christ and in the spiritual improvement of mankind."  Def. Stmt. Mat. Facts 2, ¶ 3.

The Rescue Mission provides "spiritual guidance, Christian counseling, and Christian religious

services to" its guests, residents, and members of the general public "who desire to learn about

Jesus Christ."  *Id.* at ¶ 9.  It "conducts numerous religious activities every day, including worship

services, bible studies and prayer."  *Id.*  The Rescue Mission operates both the River of Life

Facility homeless shelter in which Chinn stayed and the City Light Facility Discipleship

Program in which Cowles resided.  *Id.* 2, ¶ 6; *id.* 3, ¶ 10; *id.* 7, ¶ 20.  The Court holds that these

undisputed facts demonstrate that the Rescue Mission is a religious organization that operates the homeless shelter and the Discipleship Program.

       2.      <u>The Rescue Mission operates the homeless shelter and the Discipleship Program for "other than a commercial purpose."</u>

The FHA does not define "commercial purpose."  However, the Sixth Edition of Black's Law Dictionary,[6] defines "commercial activity" as "including any type of business or activity which is carried on for a profit."  *Black's Law Dictionary* 270 (6th Ed. 1990).

The Court finds that defining "commercial activity" as one carried on for a profit, and hence a "commercial purpose" as one that has the purpose of generating a profit, is consistent with the ordinary meaning of "commercial," which the Court assumes Congress intended.  *See Mills Music*, 469 U.S. at 164.  This definition also is consistent with the statutory language of the religious exemption.  Specifically, the statutory language of the exemption encompasses not only the occupancy of a religious organization's dwellings, but also the sale and rental of such dwellings.  *See* 42 U.S.C. § 3607(a).  This statutory language demonstrates that a purpose is not a "commercial purpose" simply because it generates revenue (e.g., through either the rental or sale of the religious organization's dwellings), but instead must be a purpose beyond simply generating revenue, such as generating a profit.

---

[6] The current (Eighth) edition of Black's Law Dictionary does not include a definition for "commercial activity."

The Court holds, based on the ordinary meaning of "commercial" and the religious

exemption's statutory language, that a religious organization owns or operates dwellings for a

"commercial purpose" if it owns or operates those dwellings for the purpose of generating a

profit.  The Court further holds that the Rescue Mission's operation of the homeless shelter and

the Discipleship Program is not for a commercial purpose because the Rescue Mission does not

operate the shelter or the Discipleship Program for the purpose of generating revenue, let alone

for generating a profit.

Plaintiffs argue that the Rescue Mission facilities are operated for a "commercial

purpose," pointing only to the facts that the Rescue Mission is incorporated under the laws of the

State of Idaho, and that the operation of the facilities "furthers the purposes for which [the

Rescue Mission was] established."  Pls. Resp. Mot. Summ. J. at 8.  The mere incorporation of

the Rescue Mission with the state as a non-profit corporation, and the furthering of the Rescue

Mission's purposes does not demonstrate that the Rescue Mission's operation of the shelter and

Discipleship Program is for a "commercial purpose" in the absence of any evidence that such

operation is carried on for the purpose of generating a profit.

3.   The Rescue Mission does not limit occupancy of the shelter and residency in the
     Discipleship Program to persons of the same religion, or give preference to such
     persons.

To qualify for the religious exemption, the Rescue Mission must demonstrate that the

alleged conduct that Plaintiffs are challenging falls within the parameters of limiting occupancy

of the shelter and residency in the Discipleship Program to persons of the same religion, or giving preference to such persons.  *See* 42 U.S.C. § 3607(a).

Chinn explicitly disclaims that he is of the same religion as the Rescue Mission, and no evidence shows that he became "the same religion" as the Rescue Mission simply by attending religious services.  Further, the Rescue Mission's alleged preferential treatment of individuals who attend or participate in religious services does not fall within the meaning of giving preference to "persons of the same religion."  *See* 42 U.S.C. § 3607(a).

Cowles also explicitly disclaims that she is of the same religion as the Rescue Mission, and no evidence shows that Cowles became "of the same religion" as the Rescue Mission by participating in the Discipleship Program.  Further, the Rescue Mission's requirement that residents in the Discipleship Program participate in religious activities, and imposition of a requirement that the residents who are not Christian convert to Christianity to graduate from the Program, does not fall within the meaning of limiting occupancy to, or giving preference to, "persons of the same religion."  *See* 42 U.S.C. § 3607(a).

In sum, the evidence does not support the conclusion that the Rescue Mission limits occupancy of the shelter or residency in the Discipleship Program to, or gives preference to, "persons of the same religion."  Accordingly, the Court holds that the FHA's religious exemption does not apply to the Rescue Mission's operation of the shelter and Discipleship Program.

C.      The Rescue Mission's activities are protected under the First Amendment.

        The Rescue Mission argues that its activities are protected under the First Amendment to

the U.S. Constitution and that application of the FHA to prohibit its activities violates the

Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, *et seq*.

        1.      Applicability of the Religious Freedom Restoration Act.

        The Religious Freedom Restoration Act (RFRA) provides: "Government shall not

substantially burden a person's exercise of religion even if the burden results from a rule of

general applicability," unless the government demonstrates that "application of the burden to the

person . . . (1) is in furtherance of a compelling governmental interest; and (2) is the least

restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(a),

(b).

        Plaintiffs argue, for the first time in their Motion to Alter or Amend the Judgment, that

the RFRA does not apply to this action because the action is a dispute between private parties.

        The Ninth Circuit has not directly addressed the use of the RFRA as a defense to the

enforcement of a federal statute in a lawsuit between private parties.  It has, however, addressed

the applicability of the RFRA in other contexts.  In *Sutton v. Providence St. Joseph Med. Ctr.*,

192 F.3d 826 (9th Cir. 1999), the defendant, a private employer, offered a job to the plaintiff, and

the plaintiff accepted.  *Id.* at 829.  Prior to the start of employment, the defendant employer

required, among other things, that the plaintiff provide his social security number, which the

plaintiff refused to do, citing religious grounds.  *Id.* at 829-30.  The defendant refused to hire the

plaintiff, and the plaintiff filed suit, alleging that the defendant employer violated his rights

under the RFRA and other statutory provisions.  *Id.* at 830.  The Ninth Circuit held that because

the employer was a private party, and not a government actor, it could not be held liable for

violating the RFRA.  *Id.* at 834.  The Court did not, however, address whether the RFRA could

be used in a private action as a *defense* to enforcement of a federal statute.

 In *Worldwide Church of God v. Philadelphia Church of God*, 227 F.3d 1110 (9th Cir.

2000), the plaintiff filed a copyright infringement lawsuit against the defendant, alleging that the

defendant was copying and distributing the plaintiff's copyrighted material without permission.

*Id.* at 1112.  The defendant raised the RFRA as a defense, claiming that the copyrighted material

"is central to its religious practice and required reading for all members." *Id.* at 1113.  The Ninth

Circuit declined to address whether the RFRA applied, holding instead that even if the RFRA did

apply, the defendant had not demonstrated that the relief sought by the plaintiff—preventing the

defendant from copying and distributing the copyrighted material without prior permission and,

presumably, payment of a fee—would substantially burden the free exercise of religion.  *Id.* at

1120-21.

 The Second Circuit is the only circuit court to squarely address the use of the RFRA as a

defense in a private action between private parties.  *See Hankins v. Lyght*, 441 F.3d 96, 103 (2d

Cir. 2006).  In *Hankins*, the Second Circuit held that the RFRA could be used as a defense in a

26

private action between private parties seeking to enforce the Age Discrimination in Employment

Act ("ADEA").  *Id.*  The court reasoned:

> The ADEA is enforceable by the EEOC as well as private plaintiffs, and the substance of
> the ADEA's prohibitions cannot change depending on whether it is enforced by the
> EEOC or an aggrieved private party.  An action brought by an agency such as the EEOC
> is clearly one in which the RFRA may be asserted as a defense, and no policy of either
> the RFRA or the ADEA should tempt a court to render a different decision on the merits
> in a case such as the present one.

*Id.*; *but see id.* at 114 (Sotomayor, J., dissenting) ("RFRA by its terms does not apply to suits

between private parties."); *Rweyemamu v. Cote*, 520 F.3d 198, 203-04 (2d Cir. 2008) (expressing

"doubts about *Hankins*'s determination that RFRA applies to actions between private parties

when the offending federal statute is enforceable by a government agency"); *Tomic v. Catholic

Diocese of Peoria*, 442 F.3d 1036, 1042-43 (7th Cir. 2006) (finding the *Hankins* decision

"unsound" because the RFRA was applicable only to suits in which the government is a party);

*Redhead v. Conference of Seventh-Day Adventists*, 440 F. Supp. 2d 211, 218-19 (E.D.N.Y. 2006)

(voicing doubts about the RFRA's applicability to suits between private parties, but applying the

RFRA to a suit between private parties because of the constraints of controlling precedent).

The Court declines to resolve whether the RFRA can be invoked as a defense in this

action because, as discussed below, regardless of whether the RFRA applies, the Rescue

Mission's activities in operating the homeless shelter and the Discipleship Program are protected

by the Free Exercise Clause of the First Amendment.

27

Moreover, according to the Rescue Mission, Plaintiffs receive "Private Enforcement Initiative" grants from HUD to engage in private enforcement activities, such as this lawsuit.  If this is true, Plaintiffs possibly would be deemed "government actors."  If Plaintiffs are deemed "government actors," under Ninth Circuit precedent, the RFRA would apply to Plaintiffs' attempt to enforce the FHA against the Rescue Mission.  *See Sutton*, 192 F.3d at 834.  However, because Plaintiffs raised this issue for the first time in a Rule 59(e) Motion to Alter or Amend, Defendants have not had the opportunity to submit to the Court evidence demonstrating that Plaintiffs receive such funds.  For this additional reason, the Court declines to resolve the applicability of the RFRA to this action.

       2.     <u>Free Exercise Clause of the First Amendment</u>.

The Rescue Mission argues that their activities are protected under the Free Exercise Clause of the First Amendment.  The Court agrees and holds that application of the FHA to prohibit the Rescue Mission's activities in the operation of the homeless shelter and the Discipleship Program would violate the Free Exercise Clause.

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]."  U.S. Const. amend. I.  "A statute burdens the free exercise of religion if it 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs . . . ."  *Guam v. Guerrero*, 290 F.3d 1210, 1222 (9th Cir. 2002) (citation omitted).  "[T]he right to the free exercise of religion unquestionably encompasses the right to preach, proselyte,

28

and perform other similar religious functions . . . ."  *McDaniel v. Paty*, 435 U.S. 618, 626 (1978) (citation omitted).

In determining whether application of a statute would violate the Free Exercise Clause, a court

> must weigh three factors: (1) the magnitude of the statute's impact upon the exercise of the religious belief, (2) the existence of a compelling [government] interest justifying the burden imposed upon the exercise of the religious belief, and (3) the extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the [government].

*Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 946 (9th Cir. 1999) (citations and internal quotation marks omitted).

> a. <u>Application of the FHA would have a tremendous negative impact on the Rescue Mission's exercise of religious beliefs.</u>

As discussed above, the Rescue Mission is a Christian-based religious organization that was formed "for the purpose of providing 'for the worship of God, the teaching and preaching of the Word of God, the winning of people to a personal faith in the Lord Jesus Christ and in the spiritual improvement of mankind.'"  Roscoe Aff. 2, ¶ 3; *see* Def. Stmt. Mat. Facts 2, ¶ 3.  The Rescue Mission provides spiritual guidance, Christian counseling, and religious services to shelter guests and the general public, and conducts numerous religious activities daily, including worship services, bible studies, and prayer.  Def. Stmt. Mat. Facts 2, ¶ 9.  Specific to the Discipleship Program, the Rescue Mission operates the Program to enable residents "to free

themselves from the addictions and destructive habits of their old life by his or her personal faith in Christ," and believes that "[r]eligious study is the very essence of the Discipleship Program, and the program would be nothing if stripped of its religious component."  Def. Stmt. Mat. Facts at 7, ¶¶ 21, 24.

Applying the FHA to prohibit the Rescue Mission from teaching, preaching, and proselytizing to individuals on its own property, whether they be shelter guests, Discipleship Program residents, or other individuals; requiring shelter guests to attend religious services, or giving preference to such guests; limiting participation in the Discipleship Program to those who are, or who desire to be, of the same religion; and requiring Discipleship Program participants to comply with the religious component of the Program, would have a tremendous negative impact upon the exercise of the Rescue Mission's religious beliefs.  *See McDaniel*, 435 U.S. at 626 ("[T]he right to the free exercise of religion unquestionably encompasses the right to preach, proselyte, and perform other similar religious functions . . . .").  Indeed, as pointed out by the Rescue Mission, prohibiting the Rescue Mission from engaging in the activities challenged by Plaintiffs would result in requiring "a religious organization to remove religion from its religious programs," and prohibit a religious organization from choosing how "to introduce its religious beliefs to people who voluntarily come to the organization."

      b. <u>The compelling government interest does not justify the burden imposed on the Rescue Mission's exercise of religious beliefs.</u>

There is no doubt that providing fair housing through the prohibition of religious discrimination is a compelling government interest.  However, "[s]ome religious interests under the Free Exercise Clause are so strong that no compelling [governmental] interest justifies government intrusion into the ecclesiastical sphere." *Bollard*, 196 F.3d at 946.  For example, "[a] secular court may not . . . adjudicate matters that necessarily require it to decide among competing interpretations of church doctrine, or other matters of an essentially ecclesiastical nature, even if they also touch upon secular rights." *Id.* (citations omitted).  "A church's selection of its own clergy is one such core matter of ecclesiastical self-governance with which the state may not constitutionally interfere." *Id.*

 The Court finds the following activities of the Rescue Mission to also be among the religious interests that are so strong that no compelling governmental interest justifies intrusion into the ecclesiastical sphere:  teaching, preaching, and proselytizing to individuals on its own property; treating preferentially guests on its property who attend religious services; limiting participation in a residential addiction recovery program to individuals who are or who wish to be of the same faith; and imposing requirements that guests and residents on its property attend and/or participate in religious services and activities.  *See id.*

c.      The recognition of an exemption under these circumstances would not impede the purpose of the FHA.

Finally, the purpose of the FHA is "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. Allowing religious discrimination would, under most circumstances, impede that purpose. However, the FHA already recognizes a religious exemption from its requirements, demonstrating that in some circumstances, religious discrimination is allowed under the FHA. *See* 42 U.S.C. § 3607(a).

As discussed above, the Rescue Mission's operation of the shelter and the Discipleship Program does not fall within the FHA's religious exemption only because the Rescue Mission does not limit occupancy of the shelter and residency in the Discipleship Program to persons of the same religion, or give preference to such persons. Although the Rescue Mission does not qualify for the FHA's religious exemption, the Court finds that recognizing an exemption from the FHA under the circumstances of this case would not impede the purpose of the FHA.

Accordingly, the Court holds that the government's compelling interest in providing fair housing through the prohibition of religious discrimination is insufficient, under the circumstances of this case, to overcome the Rescue Mission's religious rights and interest in engaging in their activities of teaching, preaching, and proselytizing to individuals on its own property; requiring shelter guests to attend religious services, or giving preference to such guests; limiting participation in the Discipleship Program to those who are, or who desire to be,

32

of the same religion; and requiring Discipleship Program participants to comply with the religious component of the Program.  *See EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 467-68, 470 (D.C. Cir. 1996) (holding that government's interest in eliminating employment discrimination is insufficient to overcome a religious institution's interest in being able to employ ministers of its choice; and that employment discrimination claims impermissibly burden the church's free exercise of religion and are therefore barred by the Free Exercise Clause);  *cf. Bollard*, 196 F.3d at 947 (allowing sexual harassment claim to go forward against religious organization because the religious organization did not offer a religious justification for the alleged harassment and indeed condemned the alleged harassment as inconsistent with the values and beliefs of the organization).

D.    The Rescue Mission is entitled to summary judgment on Plaintiffs' claim of "interference" under 42 U.S.C. § 3617.

Under the FHA's "interference" or "retaliation" provision, it is "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by" the FHA.  42 U.S.C. § 3617.  "[T]he language 'interfere with' has been broadly applied 'to reach all practices which have the effect of interfering with the exercise of rights' under the federal fair housing laws." *United States v. City of Hayward*, 36 F.3d 832, 835 (9th Cir. 1994) (citations omitted).

As discussed above, the shelter is not a "dwelling" and is therefore not subject to the

FHA.  Moreover, as also discussed above, the Rescue Mission's alleged activities in relation to

both the shelter and the Discipleship Program are protected by the First Amendment.

Accordingly, those activities cannot be deemed as "interfering" with the exercise by Chen or

Cowles of "rights" protected by the FHA.  *See* 42 U.S.C. § 3617.

E.     The Rescue Mission is entitled to summary judgment on Plaintiffs' sex discrimination
       claim.

While the focus of this case is religious discrimination, Plaintiffs also raise a sex

discrimination claim.  Specifically, Plaintiffs allege that similarly situated male residents in the

Discipleship Program at the River of Life Facility were permitted to work when Cowles was not,

and were permitted to have more frequent visitors of the opposite sex.  *See* V. Compl. 10, ¶ 37.

The only evidence Plaintiffs put forth in support of this allegation is Cowles' affidavit.

In her affidavit, Cowles states:

The City Light facility allows only female residents.  While residing at the City Light
facility, I was not permitted to work and was permitted to have only very brief visits with
my then seven-year-old son for a two hour period on one day per week.  Similarly-
situated male residents at the male-only facility operated by the Defendants were
permitted to work and have more frequent visitors of the opposite sex.

*See* Cowles Aff. 5, ¶ 20.

Cowles' affidavit does not demonstrate that she has personal knowledge of specific males

residents of the River of Life Discipleship Program who were similarly situated to her and who

34

were treated differently than she was in terms of being permitted to work and have visitors of the

opposite sex.  Her conclusory affidavit is thus insufficient to defeat summary judgment on this

issue.  *See* Fed. R. Civ. P. 56(e) ("A supporting or opposing affidavit must be made on personal

knowledge, set out facts that would be admissible in evidence, and show that the affiant is

competent to testify on the matters stated."); *Casey*, 4 F.3d at 1527 ("Conclusory affidavits that

do not affirmatively show personal knowledge of specific facts are insufficient.").

IV.

The Court grants summary judgment on all claims raised by Plaintiffs.

The Court holds that the homeless shelter is not a dwelling and is not, therefore, subject

to the requirements of the FHA.  The Court further holds that, even assuming the shelter is a

dwelling and thus is subject to the FHA, the Rescue Mission's alleged activities of requiring

shelter guests to attend religious services and/or giving preference to such guests are protected

by the Free Exercise Clause of the First Amendment.

The Court holds that the Rescue Mission's alleged activities of limiting residency in the

Discipleship Program to those who are or desire to be of the same faith as the Rescue Mission,

requiring residents of the Program who are not Christian to convert to Christianity to graduate

from the Program, and requiring residents of the Program to participate in the religious services

and activities also are protected by the Free Exercise Clause of the First Amendment.

35

The Court holds that because the Rescue Mission's alleged activities are protected by the First Amendment, those activities cannot "interfere" with the exercise by Chen or Cowles of "rights" protected by the FHA.

Finally, the Court holds that Plaintiffs have failed to put forth evidence sufficient to defeat summary judgment on Plaintiffs' claim of sex discrimination.

## ORDER

Being fully advised in the premises, the Court hereby orders that Plaintiffs' Motion to Alter or Amend a Judgment Pursuant to Federal Rule of Civil Procedure 59(e) (Docket No. 32) is GRANTED in part and DENIED in part.  The motion is granted only to the extent that the Court has amended its decision as reflected in this Amended Memorandum Order to address arguments raised by Plaintiffs.  The motion is otherwise DENIED.  The Court reaffirms its previous order GRANTING Defendants' Motion for Summary Judgment (Docket No. 18), and DISMISSING the case in its entirety.

DATED:  **May 12, 2010**

Honorable Edward J. Lodge
U. S. District Judge

36